1

1  IN THE UNITED STATES DISTRICT COURT
   FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2

3
   UNITED STATES OF AMERICA :
4                          :
                          :
5      VS            :
                    : NO. 09-CR-247
6  ROBERT MERICLE      :

7

8
                  TRANSCRIPT OF PROCEEDINGS
9             OF ARRAIGNMENT AND GUILTY PLEA

10
       BEFORE:   HONORABLE EDWIN M. KOSIK
11               United States District Judge

12
       DATE:   Wednesday, September 2, 2009
13

14     PLACE:   United States District Court
                Middle District of Pennsylvania
15              235 North Washington Avenue
                Scranton, Pa  18503
16

17

18 A P P E A R A N C E S:

19 For The Government:    GORDON ZUBROD, ESQ.
                         Assistant United States Attorney
20

21
   For Defendant:      WILLIAM WINNING, ESQ.
22                     PAUL J. WALKER, ESQ.

23

24              LAURA BOYANOWSKI, RPR
                OFFICIAL COURT REPORTER
25

2

1          MR. ZUBROD:  May it please the Court, we're here in

2    the case of United States America versus Robert Mericle,

3    criminal number 3:C-R-09-247.  Pursuant to a negotiated plea, a

4    criminal information has been filed against Mr. Mericle

5    charging him with a violation of 18 U.S.C. Section 4,

6    misprision of a felony.  We are prepared to proceed with his

7    waiver of indictment and with his plea.

8          THE COURT:  Okay.  So you are Robert Mericle?

9          THE DEFENDANT:  Uh-huh.

10          THE COURT:  Pull that mic closer to you.  The

11    gentlemen on both your sides are representing you in this

12    matter?

13          MR. WINNING:  Yes, Your Honor, William Winning and

14    Paul Walker representing Mr. Mericle in this matter.

15          THE COURT:  Okay, fine.  Mr. Mericle, this proceeding

16    is going to take us 10 or 15 minutes.  And in it I have to ask

17    you a bunch of questions, and your responses to me must be

18    under oath.  So if you raise your right hand, I will ask this

19    young lady to administer the oath.

20          ROBERT MERICLE, called as a witness, being duly

21    sworn, testified as follows:

22    EXAMINATION

23    BY THE COURT:

24    Q.   State for the record your age and the extent of your

25    education.

3

1   A.   I'm 46 years old.  I have a bachelor of science in

2   economics.

3   Q.   And what kind of work -- we know, but you must make a

4   record.  What kind of work do you do?

5   A.   I am a real estate developer.

6   Q.   And are you presently under the care of a physician or a

7   physician psychiatrist?

8   A.   No, I'm not, Your Honor.

9   Q.   Taking any kind of medication that could affect your

10  ability to understand what we're doing here today?

11  A.   No, Your Honor.

12  Q.   In introducing this case, counsel for the government tells

13  us that we're proceeding on an information; is that correct?

14  A.   Yes, Your Honor.

15  Q.   It so happens that the offense that is charged in the

16  information is a felony.  And I am obliged to tell you in

17  federal court before the government can proceed against an

18  individual with a felony charge they must first go before a

19  dually constituted grand jury.

20       A grand jury is a body consisting anywhere between 16 and

21  23 individuals who don't determine of guilt or innocence.  They

22  simply inquire into the subject of crime.  If they find there's

23  probable cause that a crime has been committed based on

24  evidence offered by the United States Attorney, the jury if

25  they also find there's probable cause to charge the person

4

1  named by the United States Attorney, can return an indictment

2  providing at least 12 of those members vote that an indictment

3  be returned.

4      In this case, you waived that kind of a presentment and

5  you decided to proceed on an information; is that correct?

6  A.    That is correct, Your Honor.

7          THE COURT:  It's my understanding also that there's a

8  plea agreement here; is that correct, Mr. Zubrod?

9          MR. ZUBROD:  That's correct, Your Honor.

10 BY THE COURT:

11 Q.    Have you authorized your counsel to negotiate that

12 agreement in your behalf?

13 A.    Yes, I have, Your Honor.

14 Q.    As a matter of fact, you and your counsel have signed the

15 agreement; isn't that correct?

16 A.    That is correct, Your Honor.

17 Q.    Please listen.  I will ask Mr. Zubrod to give us the terms

18 of that agreement.

19          MR. ZUBROD:  May I approach, Your Honor?

20          THE COURT:  You can sit, or you can stand.

21          MR. ZUBROD:  May it please the Court, the plea

22 agreement calls for Mr. Mericle to waive indictment by a grand

23 jury and to plead guilty to a one-count felony information

24 filed against him by the U.S. Attorney's Office for the Middle

25 District.  That information will charge him with a violation of

5

1  Title 18 United States Code, misprision of a felony, that is

2  relating to the filing of false tax returns by former judges

3  Conahan and Ciavarella.  The maximum penalty for that offense

4  is imprisonment for a period of up to three years, a fine of

5  $250,000 and a maximum term of supervised release to be

6  determined by the Court as well as a $100 special assessment.

7  Mr. Mericle additionally agrees to continue his cooperation

8  with the United States.

9           Mr. Mericle has contributed already the sum of

10  $2,150,000 to an escrow account held by his attorney, Mr.

11  Winning, for the purposes of funding programs for the health,

12  safety and general welfare of the children of Luzerne County,

13  Pennsylvania.  These funds will be disbursed to appropriate

14  organizations for those purposes by order of the Court pursuant

15  to recommendations which we submitted by the parties at a later

16  date.

17           The United States agrees that it will not bring any

18  other charges against the defendant directly arising out of the

19  misprision charges as they relate to the filing of false tax

20  returns, and they will further recommend that Mr. Mericle

21  receive a two- or three-level departure for acceptance of

22  responsibility, whichever level applies.  Should the United

23  States move for a downward departure based upon substantial

24  assistance, it will recommend a sentence at the bottom of the

25  ultimate guideline range.

1          Additionally, Your Honor, the United States has --

2   the parties have agreed to recommend as follows relating to the

3   application of the guidelines:  This is a non-binding

4   recommendation upon the Court.  Based upon our interpretation

5   of the sentencing guidelines as they apply to the defendant,

6   the initial offense level is 20.  The tax loss in excess of

7   200,000 but less than 400,000, the applying an additional two

8   levels for use of sophisticated means, subtracting nine levels

9   under the guidelines for 18 U.S.C. 4, subtracting two levels

10  for full acceptance of responsibility making for an offense

11  guideline level of nine, criminal history category of one.

12          The parties agree that no other enhancement or upward

13  adjustment applies in calculating the applicable guideline

14  range.  At the time of sentencing, the United States will

15  recommend the Court impose a minimum sentence within the

16  applicable ultimate guideline range.

17  BY THE COURT:

18  Q.   You heard counsel for the government.  And is what he

19  tells us represent your understanding of the plea agreement and

20  its terms?

21  A.   Yes, it does, Your Honor.

22          THE COURT:  I saw counsel stand up --

23          MR. WINNING:  Your Honor, I was simply going to

24  confirm as Mr. Zubrod indicated to the Court that pursuant to

25  the plea agreement there was a requirement by the government

7

1  for Mr. Mericle to make such a contribution.  I wanted to

2  confirm to Your Honor on the record that contribution has, in

3  fact, been made already to an appropriate escrow account

4  subject to Your Honor's approval down the road.

5           THE COURT:  Mr. Mericle has acknowledged those are

6  the terms as far as he understands them.  I would further ask

7  if there's any further explanation concerning any of those

8  terms or we let them stand the way it is.  First I will ask the

9  lawyers.

10          MR. ZUBROD:  No, sir.

11          MR. WINNING:  No, sir.

12          THE COURT:  Okay.  You agree with that, Mr. Mericle?

13          THE DEFENDANT:  I do agree, Your Honor.

14  BY THE COURT:

15  Q.   Mr. Mericle, in federal court congress has passed

16  sentencing guidelines, and those guidelines are intended to

17  bring about some form of equality in the sentencing that is

18  imposed throughout the United States so that they are actually

19  in an advisory capacity to a judge in formulating a sentence.

20       While we have a non-binding recommendation here, at this

21  stage the judge wouldn't have the slightest idea what an

22  appropriate sentence would be as recommended by the sentencing

23  guidelines.  Do you understand that?

24  A.   I do, Your Honor.

25  Q.   And we don't have any idea until such a time as our

8

1  probation department conducts an investigation that we know

2  something more about you and about this offense, and

3  calculations are made and a recommendation is offered for the

4  Court's consideration.  You have a very important provision in

5  your plea agreement without much elaboration.  Counsel for the

6  government has alluded to the fact there will be cooperation.

7            THE COURT:  Is that correct, Gordon?

8            MR. ZUBROD:  Yes, sir.

9  BY THE COURT:

10 Q.   Under the terms of those agreements unless I am corrected

11 otherwise, it's intended that if the government receives your

12 cooperation and if the government is satisfied with your

13 cooperation, that's something they determine for themselves.

14 The judge has no input in determining whether your cooperation

15 amounts to substantial assistance.

16      If they so determine, they may offer a recommended

17 sentence different than would be reflected by any guidelines or

18 that which is being offered in the plea agreement that you

19 people have agreed to.  Do you understand that?

20 A.   I do, Your Honor.

21 Q.   It's beneficial because in the event guidelines exceed

22 what is recommended in that plea agreement, it's very possible

23 that a lesser sentence can be imposed based upon the

24 government's recommendation, okay?

25 A.    Yes, Your Honor.

1  Q.    All right.  The most important thing in any matter of this

2  nature is that you completely understand that there's no

3  obligation for you to enter a plea of guilty and that you

4  understand that you have the right to stand trial before a

5  Court and jury.  Clear?

6  A.    Yes, Your Honor.

7  Q.    And if you elected to stand trial, you'd have the benefit

8  of a presumption of innocence that means a number of things.

9  First, the presumption of innocence means that in the trial of

10 the case there would be no obligation on your part to utter one

11 word in explanation or in defense of your conduct.  Nor would

12 you be obliged to summon witnesses to do so.

13      The important thing is that you understand that a

14 defendant has no duty or obligation at any time during the

15 course of a criminal trial.  I appreciate the fact that you can

16 afford to call witnesses.  But in the event you couldn't afford

17 to call witnesses, the government would pay for those witnesses

18 to be called in your behalf if you elected to offer such

19 testimony.  Is that clear?

20 A.    Yes, Your Honor.

21 Q.    The reason for that is that the government has to prove a

22 case with which you are charged beyond a reasonable doubt and

23 each and every element of that case.  I will ask the government

24 to tell us what their evidence would be and to tell us what the

25 elements of that offense are.

1       MR. ZUBROD:  May it please the Court, the defendant

2 is entering a plea of guilty to misprision of a felony, Title

3 18 United States Code Section 4.  In broad brush, this is what

4 this case is about.  Judges for the courts of common pleas are

5 required to file financial disclosure reports annually to the

6 Administrative Offices of the Pennsylvania Courts located in

7 Dauphin County, Pennsylvania and within the Middle District of

8 Pennsylvania.

9       Michael T. Conahan was a judge for the Court of

10 Common Pleas for Luzerne County, Pennsylvania.  Between January

11 of 2002 and January of 2007, Judge Conahan served as the

12 president judge for Luzerne County.  Mark A. Ciavarella was a

13 judge for the Court of Common Pleas for Luzerne County,

14 Pennsylvania.  Beginning in about 1996 to June of 2008, Judge

15 Ciavarella served as the head of the juvenile court for Luzerne

16 County.

17       In January of 2007, Judge Ciavarella was appointed

18 president judge for Luzerne County.  As judges for the Luzerne

19 County Court of Common Pleas and as public officials in the

20 Commonwealth of Pennsylvania, Judge Conahan and Judge

21 Ciavarella owed a duty of honest services to the public and

22 were charged with serving the people of Luzerne and the

23 Commonwealth of Pennsylvania in a fiduciary capacity, that is

24 the defendants' election to high public and judicial office

25 carried with it the trust and confidence of the citizens of

1  Pennsylvania that the defendants would exercise their judicial

2  functions and duties for the benefit of the people with

3  scrupulous good faith, impartiality, candor and without

4  corruption and self-dealing.

5       Robert J. Powell was an attorney whose principal

6  office was in Luzerne County, Pennsylvania.  Mr. Powell's firm

7  known as the Powell Law Group specialized in plaintiff's tort

8  litigation among other areas.  In approximately late 1999 or

9  early 2000, Robert Powell approached Judge Conahan and Judge

10 Ciavarella for the purpose of getting their agreement to build

11 a youth detention center in Luzerne County.

12      Conahan and Ciavarella agreed to support the project

13 having concluded that the Luzerne County youth detention center

14 was deteriorating.  Judge Ciavarella recommended that Powell

15 use Mericle Construction for the project.  Mr. Powell

16 ultimately retained Mericle Construction to build the facility

17 because it had submitted the lowest bid.  On January 29th,

18 2002, president judge -- then President Judge Conahan signed a

19 placement guaranty agreement between Pennsylvania Child Care,

20 which was the youth detention center built by Mr. Powell and

21 the Court of Common Pleas for Luzerne County to house juvenile

22 offenders at P. A. Child Care.

23      The placement guaranty agreement provided that the

24 Court of Common Pleas for Luzerne County would pay P. A. Child

25 Care the annual rental installment sum of $1,314,000 and

12

1    stipulated to the obligation of the Court to make payment of

2    the rental installments shall be absolute and unconditional.

3    Following the execution of the placement guaranty agreement, P.

4    A. Child Care began building the new juvenile placement

5    facility to replace the county facility using Mericle

6    Construction as the builder.

7            Robert Mericle in this process suggested to Mr. --

8    Judge Ciavarella that Judge Ciavarella should receive a

9    finder's fee because of Judge Ciavarella's role in recommending

10   Mericle Construction for the project.  Judge Ciavarella

11   directed Mr. Mericle to send the money to Powell.  Ciavarella

12   wanted the finder's fee that was paid -- being paid to him to

13   be made to look as if it had been paid to Powell.  Unbeknownst

14   to Mr. Mericle at the time, Judge Ciavarella had agreed to

15   share the finder's fee with Judge Conahan.

16           Beginning in December of 2002 after Mr. Powell and

17   others committed to personally guarantee the necessary

18   financing to build P. A. Child Care and as construction was

19   nearing completion, Mr. Powell was directed by the judges to

20   let the money pass through those accounts and on to the judges.

21   On January 21, 2003, Mericle Construction wired $610,000 of a

22   brokerage fee agreement to an attorney in Schuylkill County,

23   Pennsylvania who wired it to the judges.

24           The remainder of the money of the brokerage fee,

25   $387,600 was wired to Mr. Powell on or about January 24, 2003,

1  all of this at the direction of Judge Ciavarella.  The majority

2  of the remainder of the money was subsequently transferred by

3  Mr. Powell to Judge Conahan and Judge Ciavarella at their

4  direction.

5          At some point, Mr. Mericle became aware that the

6  judges were filing false tax returns.  In other words, he was

7  aware that the payments were being disguised by Judges Conahan

8  and Ciavarella as payments to Robert Powell.  Mr. Mericle was

9  implicitly aware that the judge would of necessity have

10  intended to falsely characterize the nature of their income on

11  their tax returns.

12          In fact, federal income tax returns relating to the

13  tax years 2003, 2005 and 2006 were filed with the Internal

14  Revenue Service and signed by Judges Conahan and Ciavarella

15  which were materially false to the extent that they

16  mischaracterized the income that they received from Robert

17  Powell and from Robert Mericle.  For the tax years 2003, 2005

18  and 2006, the tax loss to the government for Judge Conahan's

19  and Judge Ciavarella's parts in the scheme was in excess of

20  $200,000 but less than $400,000.

21          Mr. Mericle did not make any payments to the judges

22  in 2004.  Thus, the tax loss for the year 2004 is not

23  attributable to Mr. Mericle.  Due to the success of the

24  juvenile detention facility being operated in Luzerne County,

25  Mr. Powell and his partner doing business as Western P. A.

14

1  Child Care constructed another juvenile detention facility in

2  western Pennsylvania.  Robert Mericle was again employed to

3  construct the Western P. A. Child Care facility.  Robert

4  Mericle again offered a finder's fee to Judge Ciavarella.  And

5  in July of 2005 upon completion of construction, a $1 million

6  payment was made to Judges Conahan and Ciavarella by Mr.

7  Mericle.

8           Conahan and Ciavarella concealed the payment by

9  directing the money be sent to Pinnacle Group of Jupiter, a

10  business entity owned by other persons but controlled by

11  Conahan and Ciavarella through their wives.  Mr. Powell and Mr.

12  Mericle signed a written registration commission agreement

13  prepared by Mr. Mericle which purported to be an agreement for

14  Mr. Mericle to pay a broker's fee to Mr. Powell.  In fact,

15  however, the money was wire transferred by Mr. Mericle to a

16  bank account of Pinnacle Group, a business entity owned by

17  other persons but controlled by Conahan and Ciavarella.

18           Powell and his partner doing business as P. A. Child

19  Care constructed the additional -- the addition to the western

20  -- the juvenile detention facility in Luzerne County.  Mr.

21  Mericle was again employed to complete the expansion project.

22  In February 2006, upon completion of the construction of the

23  addition, a $150,000 finder's fee was paid to Conahan and

24  Ciavarella.  Mr. Powell and Mr. Mericle again signed a

25  registration and commission agreement prepared by Mr. Mericle

15

which purported to be an agreement for Mr. Mericle to pay a

broker's fee of $150,000 to Mr. Powell.  In fact, however, the

money was transferred by Mr. Mericle to a bank account of the

Pinnacle Group of Jupiter, a business entity owned by other

persons but controlled by Conahan and Ciavarella.

On November 5th, 2007, Mr. Mericle was interviewed by

agents of the Internal Revenue Service.  During this interview,

Mr. Mericle failed to disclose to the investigators that Judge

Ciavarella had failed to accurately report on his federal tax

returns the subject's finder's fees.  Specifically, Mr. Mericle

was aware that the finder's fees had ultimately been paid to

Judge Conahan and Judge Ciavarella, not to Mr. Powell and that

the financial transactions in which he had participated had

been designed by Conahan and Ciavarella to create the false

impression that the finder's fees had been paid to Powell.

There's no evidence that Mr. Mericle was aware of the

other illegal activities on the part of Mr. Powell and the

judges relating to P.A. Child Care and Western P. A. Child

Care, that is regarding their placement of juveniles or the

payment of kickbacks by Mr. Powell.

On December 12th, 2007, Robert Mericle appeared

before a federal grand jury that was investigating Judges

Conahan and Ciavarella and Robert Powell.  While under oath Mr.

Mericle again concealed from and failed to disclose to the

grand jury that he was aware from the beginning that the

16

1  finder's fees were intended to be paid to Judge Ciavarella and

2  that the financial transactions relating to the finder's fees

3  were designed by Judges Conahan and Ciavarella to disguise the

4  fact that the payments were so intended.

5           Specifically, in the period before and up to December

6  of 2007, in Luzerne and Dauphin Counties, Pennsylvania within

7  the Middle District of Pennsylvania, Mr. Mericle having

8  knowledge that Michael Conahan and Mark Ciavarella were engaged

9  in the actual commission of a felony recognizable by a court of

10 the United States that is a violation of 18 U.S. Section 371

11 relating to conspiracy to defraud the United States for taxes

12 owed during 2003 and 2005 through 2007, did conceal and fail to

13 disclose this knowledge to federal investigators and to a

14 federal grand jury and did not as soon as possible make known

15 of the same to some judge or other person in civil or military

16 authority under the United States all in violation of Title 18

17 United States Code Section 4.

18           Now, if the Court would permit me, I would like to

19 place on the record the reasons why we have entered into this

20 plea agreement.

21           THE COURT:  I will be happy to hear that.  I will be

22 happy to hear that.  I hope you can tell us and explain to us

23 why such a convoluted arrangement existed to pay a finder's

24 fee.

25           MR. ZUBROD:  I will, Your Honor.  We spent an

17

extensive amount of time both investigating and researching the

law in this area.  Referral fees are a common place practice.

They are a legal practice in real estate and in the building

market.  Fee splitting between the parties, for example,

between Judge Ciavarella and Mr. Powell, that kind of fee

splitting is also a common practice in the real estate

business.  As the Court would know, if someone buys a house and

there is a -- there is a realtor representing one party, a

realtor representing the other, they split the fee which, is in

essence a finder's fee.

THE COURT:  I don't know that, but go ahead.

MR. ZUBROD:  All right.  This is not a kickback or a

bribe in any sense.  It is a common practice.  It is not a

legal quid pro quo.  It is a common practice between

businessmen in real estate transactions.  Mr. Mericle simply

paid a finder' fee to the judges in accordance with standard

practice.  To him, his payment of the fee was what he had done

hundreds of times before and was not related to the office that

the judges held or any decisions by the judges.  He had

contracted with a private party, Mr. Powell, to build a

business -- a private business.  The judges steered Mr. Powell

to Mr. Mericle because he can build the building cheaper than

anyone else.  In fact, he was the lowest bidder.  That is why

Mr. Powell chose him.  Had Mr. Powell simply paid the finder's

fee and given the money to Robert Powell to distribute as

 1  directed by Mr. Ciavarella, there would have been no
 2  prosecution of Mr. Mericle.  He had no knowledge of what
 3  happened to the money once he gave it to Mr. Powell.  He did
 4  know that the money ultimately was going to go to Judge
 5  Ciavarella and later found out it was going also to Judge
 6  Conahan.  The crime came when the Internal Revenue Service
 7  approached Mr. Mericle and asked about the finder's fee.
 8         Mr. Mericle failed to disclose to the I. R. S. that
 9  he knew that the money was intended to be paid to Judge
10  Ciavarella.  By the time he appeared in the grand jury, Mr.
11  Mericle was aware that the money was also going to Judge
12  Conahan, it was being split between them.  Knowing that, Mr.
13  Mericle failed to disclose to the grand jury that he was aware
14  who the ultimate recipients of that money were.  That failure
15  to disclose made him an accessory after the fact to the tax
16  fraud perpetrated by Judges Conahan and Ciavarella.
17         This is the basis for the misprision charge.  He
18  failed to disclose what he knew when directly asked about it.
19  The United States Attorney as part of the plea has required Mr.
20  Mericle to pay every dime that he paid to Judges Conahan and
21  Ciavarella to be paid to the children of Luzerne County.  That
22  was our idea.  Regarding the convoluted nature of it, Mr.
23  Mericle will represent to the Court that he understood this to
24  be a fee splitting arrangement and that he did not know what
25  happened once the money left him.  He filled out the papers.

19

1  He had them signed.  He was directed to have the payment made

2  to Mr. Powell and it was Mr. Powell's responsibility, his

3  understanding was, to make the distribution.

4       THE COURT:  What you're suggesting is that any

5  relationship Mr. Mericle had to the juvenile centers that were

6  constructed by him or his company was entirely different than

7  any relationship that may have existed between Mr. Powell and

8  the two judges that you were referring to; is that correct?

9       MR. ZUBROD:  That's correct, Your Honor.  In fact,

10 Mr. Powell was paying money and he understood it to be a quid

11 pro quo that he would not get juveniles anymore if he didn't

12 pay up the money.  And he paid over $700,000 for that purpose.

13      THE COURT:  I want to emphasize that distinction

14 because it's my recollection that in the case of the two judges

15 you represented that there was a quid pro quo between Mr.

16 Powell and between the judges.  That is not the case in the --

17 in this instance; is that correct?

18      MR. ZUBROD:  That's correct, Your Honor.  There's no

19 quid pro quo.

20      THE COURT:  Anything else?

21      MR. ZUBROD:  No, sir.

22      THE COURT:  Mr. Mericle, you heard counsel for the

23 government tell us what their evidence would be in this case if

24 this case went to trial.  Of course, if it did go to trial, the

25 judge would have to give some instruction to the jury.  But I

20

1  first ask you is what he tells us represent your role in the

2  offense that brings you here today?

3           THE DEFENDANT:  Yes, Your Honor.

4  BY THE COURT:

5  Q.    Before we go any further, I should tell you because it can

6  certainly very important to a person like yourself that if we

7  accept your plea here and adjudge you guilty of a felony, you

8  stand to lose certain rights.  You may lose the right to vote.

9  You may lose the right to hold public office.  In all events,

10  you will lose the right to possess a weapon for any purpose

11  whatsoever in the future.  Do you understand that?

12  A.    I do, Your Honor.

13  Q.    The Court would have to tell the jury that the charge in

14  this case is based on the statute -- crimes code statute passed

15  by the Congress of the United States and that these events did

16  occur as outlined by counsel for the government.  And the thing

17  that distinguishes an innocent or negligent or even a foolish

18  act from a criminal act is what goes on in an individual's

19  head.  So the government would have to prove that you did

20  conceal and failed to disclose and that you did so knowingly,

21  and sometimes that is difficult to prove except by any words

22  that are spoken by an individual or by the circumstances in

23  which this occurs.

24       And I can tell you that if the jury decided to believe the

25  government's evidence, they could conclude that the government

21

1  has established the necessary elements in this charge.  Having

2  said that, I ask you, how do you plead to the charge?

3  A.    I plead guilty, Your Honor.

4  Q.    Okay.

5          THE COURT:  This defendant is represented by

6  experienced counsel, and I am satisfied that he has voluntarily

7  and intelligently entered into this plea, and I will adjudge

8  him guilty of the charges contained in the information.

9          At this stage, you're going to spend some time with

10 the probation officer.  And to the extent that your lawyers

11 permit, you tell that probation officer what this Court should

12 know about you in your mind.  That probation officer will

13 conduct the investigation.  And when it's completed, there will

14 be a presentence report.  You will get a copy and your lawyers

15 and government's counsel.  If there's anything in that report

16 which you object, you first have to raise your objections with

17 the probation officer who will have a duty of trying to resolve

18 it.  And if the probation officer cannot resolve, you come into

19 a setting similar to this one and the judge will have to

20 resolve your objections.

21         Ultimately there will be no judgment of sentence

22 until we hear from you, your counsel as well as counsel for the

23 government.  Is that understood?

24         THE DEFENDANT:  Yes, it is, Your Honor.

25         THE COURT:  My understanding this is the defendant's

22

1 first appearance and he will be released on his own

2 recognizance.  And that's already been executed; is that

3 correct?

4          MR. ZUBROD:  Yes, sir.

5          THE COURT:  Anything else?

6          MR. ZUBROD:  No, sir.

7          THE COURT:  Okay.  Thank you.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

23

C E R T I F I C A T E

1

2

3          I, LAURA BOYANOWSKI, RPR, Official Court Reporter for

4   the United States District Court for the Middle District of

5   Pennsylvania, appointed pursuant to the provisions of

6   Title 28, United States Code, Section 753, do hereby certify

7   that the foregoing is a true and correct transcript of the

8   within-mentioned proceedings had in the above-mentioned and

9   numbered cause on the date or dates hereinbefore set forth; and

10  I do further certify that the foregoing transcript has

11  been prepared by me or under my supervision.

12

13                        _____
                          LAURA BOYANOWSKI, RPR
14                        Official Court Reporter

15

16  REPORTED BY:

17      LAURA BOYANOWSKI, RPR
        Official Court Reporter
18      United States District Court
        Middle District of Pennsylvania
19      235 N. Washington Avenue
        Scranton, Pennsylvania  18503

20

21

22          (The foregoing certificate of this transcript
    does not apply to any reproduction of the same by any means
23  unless under the direct control and/or supervision of the
    certifying reporter.)

24

25