# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO.  3:09-247 |
| | : | |
| v. | : | JUDGE KOSIK |
| | : | |
| ROBERT K. MERICLE | : | |

## SENTENCING MEMORANDUM
## ON BEHALF OF DEFENDANT ROBERT K. MERICLE

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

BACKGROUND ...............................................................................................3

1.  Offense and Guilty Plea. ........................................................................3

2.  Cooperation in the Government's Investigation. ....................................6

3.  Personal and Family History. .................................................................7

4.  Mericle Commercial Real Estate Services. ..........................................10

5.  Individual Acts of Kindness. ................................................................15

6.  Flood Prevention and Flood Relief Efforts. .........................................18

7.  Commitment to the Community. ...........................................................20

   A.  Greater Wilkes-Barre Family YMCA. ......................................22

   B.  Junior Achievement of Northeastern Pennsylvania. ..................23

   C.  Candy's Place Cancer Wellness Center and Hospice of the
       Sacred Heart. ..............................................................................25

   D.  Wyoming Valley Catholic Youth Center. ..................................26

   E.  Pittston Area Educational Improvement Organization. .............27

   F.  Lend A Hand Program. ..............................................................28

   G.  Other Charitable Work and Contributions. ................................29

8.  The Advisory Sentencing Guideline Calculation. ................................29

ARGUMENT ...................................................................................................30

I.  THE § 3553(a) FACTORS SUPPORT A DOWNWARD VARIANCE
    TO A SENTENCE OF PROBATION. ...................................................31

   A.  § 3553(a)(1). ..............................................................................31

i

1.      Nature and Circumstances of the Offense. .................................31

2.      History and Characteristics of the Defendant. .........................32

      a.      Mr. Mericle's Extraordinary Charitable Good Works.....................................................................32

      b.      Mr. Mericle's Profound Remorse for His Conduct........34

      c.      Community Support for Mr. Mericle. ...........................35

      d.      Mr. Mericle's Strong Employment History...................37

      e.      Innocent Third Parties. .................................................37

B.      § 3553(a)(2)(A)-(D). ............................................................40

C.      § 3553(a)(3). .........................................................................41

D.      § 3553(a)(6). .........................................................................41

E.      § 3553(a)(7). .........................................................................43

II.      THE COURT DOES NOT NEED TO GRANT A VARIANCE OR DEPARTURE TO SENTENCE MR. MERICLE TO A NON-CUSTODIAL SENTENCE. ........................................................43

CONCLUSION ................................................................................44

# TABLE OF AUTHORITIES

*Gall v. United States*, 552 U.S. 38 (2007) ..................................................30, 40, 41

*Koon v. United States*, 518 U.S. 81 (1996)..............................................................30

*Nelson v. United States*, 555 U.S. 350 (2009) (per curiam) ...................................30

*United States v. Bennett*, 9 F. Supp. 2d 513 (E.D. Pa. 1998) .................................33

*United States v. Booker*, 543 U.S. 220 (2005)........................................................31

*United States v. Bortnick*, No. 03-CR-0414, 2006 WL 680544 (E.D.
   Pa. Mar. 15, 2006) ................................................................................................33

*United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005) .....................................32, 33

*United States v. Howe*, 543 F.3d 128 (3d Cir. 2008)..................................31, 34, 35

*United States v. Jackson*, 390 Fed. Appx. 130 (3d Cir. 2010) ..........................35, 37

*United States v. Milikowsky*, 65 F.3d 4 (2d Cir. 1995)............................................38

*United States v. Parker*, 462 F.3d 273, 278 (3d Cir. 2006) ..............................42, 43

*United States v. Scibelli*, No. 08-CR-76, 2008 WL 3925317 (E.D.N.Y.
   Aug. 20, 2008) ......................................................................................................38

*United States v. Serafini*, 233 F.3d 758 (3d Cir. 2000) .....................................32, 33

*United States v. Toback*, No. 01-CR-410, 2005 WL 992004 (S.D.N.Y.
   Apr. 14, 2005)........................................................................................................38

*United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009) (en banc) ...........32, 33, 37, 38

*United States v. Wachowiak*, 496 F.3d 744, 754 (7th Cir. 2007) ...........................35

# INTRODUCTION

Robert Mericle is a person of great compassion and loyalty. To his family, his friends, his employees, and numerous charities—and even to complete strangers—Rob has always been there. As those who know him best explain, "Rob is probably the most generous and philanthropic person we know. He has helped many people in their time of need."[1]

"Rob has not forgotten his roots or where he came from and will always help others as much as possible."[2] As outlined below and in the letters submitted to the Court, Mr. Mericle has reached out to help when illness has struck and when natural disasters have hit. He has literally invited the community into his home and into his life. His "many philanthropic acts, his compassion towards others did not begin, as some may believe, after his guilty plea but have been in place life long."[3] They often involve acts performed anonymously and without any expectation of recognition.

Mr. Mericle's friends, employees, family members, and members of the community attest to his extraordinary concern for others. Those who know Rob

---

[1] Ex. C-48 (Letter of Marie Louise and Rick Harris). The supporting letters referenced herein are contained in Exhibit C and numbered within the exhibit. C-48, for example, is page 48 of Exhibit C. Additional supporting letters not cited herein also are in Exhibit C.

[2] Ex. C-187 (Letter of Robert Sutkowski).

[3] Ex. C-67 (Letter of James Gallagher).

well describe him as "warmhearted," "compassionate," "generous," "caring," "loyal," and "a true friend."[4]

It is one of these traits—and Rob's terrible lapse of judgment—that has brought him before the Court for sentencing. The offense for which Mr. Mericle is to be sentenced stems from misplaced loyalty—misprision of tax crimes carried out by others, a failure to report facts that would have implicated them with the IRS. Rob takes full responsibility for his conduct and is profoundly sorry for what he has done. Three years ago, he unequivocally demonstrated his remorse when he testified before this Court in one of the most significant criminal trials in this District and assisted the government in the conviction of the very former public official about whom he had previously been reluctant to speak (which was the basis for Rob's misprision charge).

As Rob now stands before the Court for sentencing, we respectfully ask that the Court consider his offense against this backdrop and a lifetime of extraordinary dedication to helping others. We respectfully submit that Mr. Mericle's case

---

[4] Exs. C-32, C-48, C-50, C-57, C-59, C-170, C-194, C-233, C-236, C-292 (Letters of Rhys Evans, Mary Louise and Rick Harris, Molly Hoegen, Anthony Raineri, Patricia Leighton, Kyle Drendall, Steven Doherty, Debra Barcklow, Kathy McLaughlin Coslett, and Michael Gallagher).

presents compelling mitigating circumstances weighing in favor of a sentence of probation pursuant to 18 U.S.C. § 3553(a).[5]

## BACKGROUND

**1. Offense and Guilty Plea.**

Mr. Mericle entered a guilty plea in 2009 to misprision of a felony for failing to disclose to government agents that he became aware that two former judges (Ciavarella and Conahan) had mischaracterized income on their tax returns. As the government explained during the plea colloquy, Mr. Mericle knew that a portion of the referral fees he had paid to Robert Powell

> ultimately was going to go to Judge Ciavarella and [Mr. Mericle] later found out it was going also to Judge Conahan. The crime came when the Internal Revenue Service approached Mr. Mericle and asked about the finder's fee . . . . This is the basis for the misprision charge. He failed to disclose what he knew when directly asked about it.

Tr. (9/2/09) (Ex. E) at 18.

The government explained during the plea colloquy that it was not illegal for Mr. Mericle to pay the referral fees. *Id.* at 17. Such fees are, as the government stated, "a common place practice" and "a legal practice in real estate and in the building market." *Id.* The government emphasized that "*[t]his is not a kickback*

---

[5] Mr. Mericle has no objection to the PSR, under which his advisory Guidelines level is 11. The government will file a motion for downward departure under U.S.S.G. § 5K1.1 of at least one level.

*or a bribe in any sense*. It is a common practice. *It is not a* legal *quid pro quo*."
*Id.* (emphasis added).

From Mr. Mericle's perspective, as the government has explained, he was simply paying an ordinary referral fee, akin to the agent fees paid in virtually every real estate transaction. *Id.* The government explained that the "payment of the fee was what he had done hundreds of times before and was not related to the office that the judges held or any decisions by the judges." *Id.* The government also explained that there was nothing illegal about Mr. Mericle's understanding that Judge Ciavarella would receive a portion of the finder's fee: "Fee splitting between the parties, for example, between Judge Ciavarella and Mr. Powell, that kind of fee splitting is also a common practice in the real estate industry." *Id.*

The government emphasized that Mr. Mericle stands in stark contrast to defendants Powell, Conahan, and Ciavarella. At the plea colloquy, the Court specifically asked the government: "What you're suggesting is that any relationship Mr. Mericle had to the juvenile centers that were constructed by him or his company was *entirely different* than any relationship that may have existed between Mr. Powell and the two judges that you were referring to; is that correct?" *Id*. at 19 (emphasis added). The government answered: "That's correct, Your Honor." *Id.* The government explained that "Mr. Powell was paying money and he understood it to be a quid pro quo that they would not get juveniles anymore if

4

he didn't pay up the money." *Id.* As to Mr. Mericle, however, "[t]here's no quid pro quo." *Id.*

Mr. Mericle had no involvement with the juvenile detention centers after his company built them. The government has emphasized that "[t]here's no evidence that Mr. Mericle was aware of the other illegal activities on the part of Mr. Powell and the judges relating to P.A. Child Care and Western P.A. Child Care, that is regarding their placement of juveniles or the payment of kickbacks by Mr. Powell." *Id.* at 15.

The government explained that Mr. Mericle's company was chosen to build the juvenile facilities in 2003 because "he can build the building cheaper than anyone else. In fact, he was the lowest bidder. That is why Mr. Powell chose him." *Id.* at 17. The government made clear: "Had Mr. [Mericle] simply paid the finder's fee and given the money to Robert Powell to distribute as directed by Mr. Ciavarella, there would have been no prosecution of Mr. Mericle." *Id.* at 17-18.

In failing to disclose everything he knew about the judges' receipt of a portion of the referral fees and the judges' mischaracterization of their income, Mr. Mericle committed a crime, for which he fully accepts responsibility. While Mr. Mericle does not in any way minimize the seriousness of his offense, we respectfully request that the Court consider the important differences between Mr.

Mericle's conduct and that of defendants Powell, Conahan, and Ciavarella in fashioning the appropriate sentence.

## 2. Cooperation in the Government's Investigation.

Mr. Mericle is profoundly sorry for, and embarrassed by, his actions. He admitted his guilt and has cooperated with the government's investigation over a period of four-and-one-years. Although Mr. Mericle's cooperation has not been perfect,[6] he testified as a critical government witness at the Ciavarella trial and has devoted countless hours to preparing for and meeting with the government, providing valuable information that has resulted in a number of additional prosecutions and guilty pleas. The government has acknowledged that Mr. Mericle's cooperation warrants a § 5K1.1 motion for substantial assistance to the government.

---

[6] Mr. Mericle acknowledges that he made a mistake during his cooperation on January 21, 2010, when he was not fully forthcoming about certain payments he made to public officials. Mr. Mericle promptly corrected that mistake, both through his counsel and in a lengthy government interview on February 17, 2010. Mr. Mericle and the government have agreed that, because he did not immediately provide the information he should have provided on January 21, 2010, he will not receive a two-level reduction for acceptance of responsibility. Thus, Mr. Mericle has agreed to a significant penalty for this mistake. That mistake, however, should not mar the more than four-and-one-half years of valuable cooperation that Mr. Mericle provided to the government, which resulted in the conviction of former judge Ciavarella and several guilty pleas. Mr. Mericle will address this issue in detail in his response to the government's U.S.S.G. § 5K1.1 motion.

The Court is familiar with Mr. Mericle's cooperation in connection with the trial of former judge Ciavarella. As demonstrated by Mr. Ciavarella's counts of conviction, the jury found Mr. Mericle to be a credible witness and accepted his testimony as truthful. Mr. Mericle's cooperation has likewise contributed to the convictions of defendants Conahan and Arnone and the prosecution of defendant Musto.

**3.    Personal and Family History.**

Mr. Mericle is 51 years old. He is a lifelong resident of Luzerne County. He married his childhood sweetheart, Kim, in 1987. He has four children: Kelly (23), Katelyn (21), Kristen (18), and Robert (15).

Rob is a loving father, son, brother, and husband. A friend writes:

> I have seen how Rob is with his family, and the love is apparent. I've always admired his relationship with his wife, Kim, who he has dated since high school. Rob and his kids have a relationship of mutual adoration. It is clear to me that he is most proud, and most happy, when he is surrounded by his family.

Letter of Erin Griffin (Ex. C-36). Mr. Mericle's "guidance and fine example are most evident in his children. His children, like him, are quiet, humble, generous and respectful." Letter of Kathy McLaughlin Coslett (Ex. C-235). The letters

submitted to the Court by Mr. Mericle's family members powerfully demonstrate how close he is to his family.[7]

Mr. Mericle's character also is illustrated by the moving letters of his friends, many of whom have known him for decades. Rhys Evans, who has known Mr. Mericle for 27 years, writes: "My opinion of him is that is he the most warmhearted person I have ever met in all my years. Kind, generous, giving, honest and overall [the] greatest friend a person could have." Ex. C-32. "It is telling that his friends today are the very same people he grew up with, went to school with and those same friends . . . stand by him today, in good times and challenging times. He has earned this friendship because of his steadfast loyalty to his friends." Letter of Francis Hoegen (Ex. C-54).[8]

Mr. Mericle is a man of deep faith and a lifelong member of St. Mary's parish. Ex. C-9 (Letter of Penny Mericle). "Rob values his Christian faith which he practices in the Catholic Church and which he has handed on to his children . . . ." Ex. C-128 (Letter of Rev. Msgr. Thomas Banick). He has served the church

---

[7] *See* Exs. C-1 through C-24 (Letters of Kim Mericle, Marie Mericle, Penny Mericle, Jeanne and Joe Elinsky, Linda Slamon, Larry Stirewalt, and other family members).

[8] *See also*, *e.g.*, Exs. C-37, C-44, C-56, C-60-61, C-70, C-72, C-206, C-223, C-242 (Letters of Guy Rothery, Teresa Hustey, Anthony Raineri, John Nargoski, Todd Moules, Carol Anstett, David Payne, Lawrence Alexander, Michael Lombardo, and Robert Gavlick).

as a member of the Finance Council, *see* Ex. C-132 (Letter of Rita Bevan), and has been a constant supporter. *See* Ex. A at p.1.

Mr. Mericle grew up in South Wilkes-Barre in a close and loving family that instilled strong values in him. His father, who left high school to join the Army, was a salesman, and his mother worked as a secretary. When Rob was a young boy, his parents took out a bank loan to buy an apartment building, and the entire family worked together to fix and furnish the apartments. Rob was just five years old when he started helping his parents with the apartment renovations. Ex. C-8 (Letter of Penny Mericle).

In June 1972, Hurricane Agnes destroyed everything the Mericle family owned. With no place to live, Rob "was sent away to live with a volunteer family." *Id.* at C-9. Hurricane Agnes was a defining event in Mr. Mericle's life, instilling in him a focus, discipline, and work ethic that he has never lost. As his sister writes, "Rob pleaded to come home to help. He came home to work every day to restore our home, eat from Salvation Army trucks, wear donated clothes and leave each night to National Army Curfew sirens. Despite his age, he was determined, reliable, and responsible." *Id.* Rob and his family worked for almost four years to clean and repair the buildings they owned.

The experience of the flood and watching his parents have everything they ever worked for disappear in front of their eyes, and then digging in and fighting

back, forged Mr. Mericle's appreciation for hard work, his commitment and determination, and his compassion for those in hard times. Throughout high school, Mr. Mericle worked every weekend and every summer to save enough money to pay for college. In college at the University of Pennsylvania, he started his own business out of his college dorm room, distributing toys for major manufacturers such as Coleco, Hasbro, and Mattel.

**4.     Mericle Commercial Real Estate Services.**

After graduating from college in 1985, Mr. Mericle returned home. As one of his former teachers explains,

> While all too often, young people leave their hometown and venture to make a name for themselves in the big city, the same could not be said about Rob Mericle. He loved his family and he loved living in Northeastern PA, and he wanted more than anything to improve the area and to help others improve their lot in life.

Letter of Mary T. Maloney McGinley (Ex. C-42).

Mr. Mericle is the president and owner of Mericle Commercial Real Estate Services ("MCRES") located in Wilkes-Barre. MCRES is a real estate development company that specializes in building projects for lease and in the construction of industrial and commercial space. MCRES is the largest commercial brokerage company in the region, serving 20 counties in Northeastern and Central Pennsylvania.

Mr. Mericle started from humble beginnings and is self-made. Through hard work, he created a successful business that has built millions of square feet of commercial and industrial real estate and recruited hundreds of businesses to Northeast Pennsylvania. He also has created thousands of jobs in the community. As a business associate who has known Rob for more than 25 years explains,

> One aspect that I always respected about Rob was his attitude toward his success. . . . He seemed to get more satisfaction from his contribution to the communities in which he did business. His first comment to me wasn't the location of the building or the tenants he was attracting to Northeastern Pennsylvania. Rather, he would comment on the number of NEW JOBS the tenants were bringing to the community he loved and cherished. His first consideration was the people. And good jobs so the workers could pay their mortgages, put their children through college, etc. . . . It was a refreshing perspective and very unique to Rob Mericle.

Letter of Michael P. Gaetano (Ex. C-200). "He works feverishly to develop our region and bring industry and additional jobs to its residents." Letter of Dr. Douglas Coslett (Ex. C-78).

Mr. Mericle's business has made a substantial and positive impact on the Northeast Pennsylvania region. He currently employs 235 people, including project managers, architects, engineers, heavy equipment operators, carpenters, plumbers, electricians, construction laborers and office personnel. *See* Letter of MCRES CFO Jennifer Kebles (Ex. C-254). In addition to these direct employees, Mr. Mericle employs more than 200 captive sub-contractors in connection with the construction and development projects undertaken by his company. *See id.*

In addition, Mr. Mericle has financed and developed projects that have brought many jobs to the region. "[M]ore than 12,000 people now work in buildings Rob has developed in Northeastern Pennsylvania and these people earn more than $400 million annually." Letter of James Cummings (Ex. C-257). Catherine Hilsher, the Deputy Director of the Luzerne County Office of Community Development, writes that Mr. Mericle

> has been and continues to be responsible for bringing many new businesses to Luzerne County that resulted in the creation of thousands of jobs for the community. Over the years, he has greatly expanded his business and as a result, has economically benefitted the area by providing countless employment opportunities.

Ex. C-98; *see also* Ex. C-217 (Letter of Stephen Yokimishyn, Regional Director, Governor's Action Team) (MCRES "has made a significant contribution toward the creation of several thousand" jobs in Northeastern Pennsylvania); Letter of Steven Barrouk (Ex. C-65).

Mr. Mericle is extremely devoted to those who work with him, "many of whom have been with Mericle since its inception." Letter of Douglas Keiper (Ex. C-85). As long-term employee Don Middleton explains, Mr. Mericle "has proven time and time again his loyalty to the employees. His concern for the employees' well-being over the years goes unmatched by any standard." Ex. C-246. Joseph J. Hourigan echoes that sentiment: "[T]here are only a handful of people that I know that would drop everything they are doing and come to my or my family's aid if

necessary, no questions asked, and I'm honored to let you know that Rob Mericle is one of those people." Ex. C-278.[9]

"[W]hen you work for Rob, you are not only an employee, but made part of his family." Letter of Donald Ragukas (Ex. C-271). William Kudrako, a contractor for MCRES, emphasizes that "I have worked as a union carpenter for forty years and have never been shown the respect and appreciation that Rob has shown me during the time I worked for him." Ex. C-230.[10]

Rob's dedication to his employees, and his willingness to always do right by them, is demonstrated time and again. Debra Barcklow, a long-time employee of MCRES, writes:

> [I]n October, 1999, my mother was diagnosed with Stage IV Non-Small Cell Lung Cancer which was terminal. . . . After discussing this with Rob, he immediately dropped his work and . . . managed to get her in [to see an oncologist] the next day and also took the time to discuss the cancer and give his advice and support. He advised and supported me during the entire time of her illness and always made it a priority no matter how busy he was to help me as situations occurred. I don't know that I would have been able to make it through this difficult time without him.

---

[9] *See also* Letter of William Letwinsky (Ex. C-264) ("[F]rom raises to Christmas parties to extra time off for an employee struggling with an illness, to personal phone calls and referrals to doctors and specialists, Rob was dedicated to caring for his employees and showed it in his quiet and consistent generosity.").

[10] *See also, e.g.*, Letters of Don Cortese, Joseph Onzik, Robert Besecker, Jr., Robert Gavlick, Daniel Connolly, Joseph DiMaggio, William Jones, Jr., Sheryl Weaver, Tania Reinert, and John Diel (Exs. C-83, C-237, C-239, C-242, C-250, C-258, C-275, C-279, C-286, C-288).

Ex. C-233.

> Scott Frask, who has worked for Mericle Construction for years, writes:

> Over the years I have had to deal with many personal issues including a divorce, my brother attempting suicide, depression, my mother having a brain aneurysm and more recently my own health issues. Rob has always provided both monetary support as well as emotional support. His willingness to help both me and my family goes far beyond the expectation any employee has of his employer.

Ex. C-266.

Long term employee James Middleton writes that, after a fire damaged his home on Christmas eve "that displaced us for many weeks," Mr. Mericle "offered us a place to stay for as long we needed to. . . . The next week, Mr. Mericle sent down a crew of men, to help with the clean up of the fire damage. . . . [T]his is how Rob is, a very giving person." Ex. C-241. Former employee Rebecca Keim writes: "When I struggled financially from life circumstances, Rob Mericle was kind. He once handed me a check for $3000 to help with my bills. . . . He did this quietly and with class and made sure that my dignity was not affected." Ex. C-215.

Daniel Naylor, who joined MCRES in August 2006, writes about Mr. Mericle's response to his unexpected deployment in Afghanistan shortly after being hired:

> Rob immediately offered his full support, questioning me to see if there was anything he could do to assist me or my family or make my transition easier. Before I left, he brought me in to his office where he provided me with a

bonus check to help my family during my deployment. This bonus wasn't just for my service with his company but for my service for our country. There was no reason he had to do that except for his compassion and generosity. Throughout my deployment there were regular phone calls made to my wife to see if there was anything she needed. Also, multiple times my wife received gift baskets from Rob just to let her know he was concerned for her well-being in my absence. His concern went beyond me alone, while I was in Afghanistan, my platoon and I received over twenty care packages from Rob. . . . When I came home on leave, Mr. Mericle had a small reception and again gave me a monetary gift in appreciation of my service and to help my family. Needless to say, it was comforting to know I had the complete support of Rob Mericle while I was deployed and when I returned.

Ex. C-231. At Mr. Naylor's request, Mr. Mericle donated labor, equipment and materials to help construct a specialty adapted home for SSG Earl Granville, a squad leader in Mr. Naylor's platoon who lost his leg in military service in Afghanistan. *Id.* at C-232.[11]

## 5. Individual Acts of Kindness.

Mr. Mericle's altruism is not limited to the workplace. Friends, acquaintances, and even complete strangers have written letters to the Court describing examples of Rob's generosity and kindness.

Mr. Mericle has literally invited flood victims into his home. As Kathy McLaughlin Coslett, who has known Mr. Mericle for 15 years, explains, "my

___

[11] Numerous other employees recount similar acts of kindness and compassion by Mr. Mericle. *See, e.g.*, Letters of employees Jim Hilsher, Peg Dwyer, Tracey Draus, Daniel Franchetti, Michael Gallagher, and Karen Stefanelli (Exs. C-248, C-260, C-268, C-273, C-292, C-294).

family and I have personally felt the Mericle generosity. When we needed a place to live after Hurricane Irene his family opened their doors to us." Ex. C-235. LaVern Idgunji, a family friend, writes that, when her home was flooded in 2011, Rob and his family "opened their home to us so we would not have to go to a shelter." Ex. C-69.

Others have experienced similar support in times of need. Karen Dussinger, the widow of a former business colleague of Mr. Mericle, writes:

> I didn't know how much my own life would fall into [Rob's] hands until my husband died unexpectedly. Rob was with me in the emergency room, saw me safely home and was the last person to leave after the funeral. He had his own contractor install an alarm system in my home almost immediately and then paid for the service himself for two years. . . . . He made me feel cared for and safe. . . . I became a member of his extended family. And when I lost my job, he was the first to offer me not just a position with his firm as a marketing manager but, said, "I'm not just offering you a job, but a (work) family." I have always known Rob to downplay his philanthropy, to perform good deeds quietly. People who are not close to Rob don't know the good he has done, the people he has comforted, the causes he has supported.

Ex. C-27.

Mr. Mericle knew Anne Lorah from their youth as members of the YMCA swim team. In 2006, Anne died from brain cancer, leaving her husband Bradley to raise their two young daughters:

> Since my wife's initial diagnosis of brain cancer, Rob has been a constant sense of strength and support for me and my family. As many of my family and friends gathered to begin waging war on brain cancer, no one surpassed Rob's empathy and compassion. Rob's enduring efforts and commitment to our cause allowed us to pursue treatments at Memorial Sloan Kettering

Hospital in New York City, which is the leading brain cancer treatment center in the world, giving us the best outcome possible for my wife. In addition, Rob personally visited my wife at our home and extended himself and his own family for comfort and support through my family's tumultuous times. Unfortunately, we lost our battle with brain cancer. . . . Rob's caring did not stop with the passing of my wife, but has continued to this day. Rob continues to provide an active support system for my family through difficult events, such as holidays, where he repeatedly extends himself and his family to us offering comfort and support.

Ex. C-25.

Charles Cheskiewicz, whose company is a tenant in one of Mr. Mericle's

buildings, writes of a similar act of kindness by Mr. Mericle:

In 2008 my wife died. At the same time the recession hit my company hard and our sales plummeted. My business was unable to pay the rent for the offices we rent from Rob. It has amazed us that he has not asked us to pay a cent for our rent for almost 4 years now, keeping my company afloat and my people employed. . . . Rob did this out of compassion for me and my situation with my wife's death and the continued employment of my people.

Ex. C-186.

Even where complete strangers are involved, Rob has reached out with

support. A friend writes: "Just recently I witnesse[d] him buy a tank of gas for

some young military personnel who couldn't get their card accepted in the pump."

Ex. C-69 (Letter of LaVern Idgunji). Another example: In July 2010, Sandy

Marcello volunteered at the St. Mary's-St. Joseph's bazaar in Wilkes-Barre, only

to find that her car had been towed while she was working for her church.

According to the news report (Ex. D):

"I was upset and crying. I had no money to get it out," she said. "I came out to help the church and didn't expect my car to get towed." Fortunately for her, a man, who wished to remain anonymous, overheard her talking about the situation and volunteered to take her to get her car. He also paid the $150 towing charge. "He was an angel. I offered to send him money each month to pay him back and he said 'absolutely not,'" she said.

That man was Rob Mericle.

## 6. Flood Prevention and Flood Relief Efforts.

On September 8, 2011, amid reports of imminent flooding—an incident eerily similar to the storm that he had experienced as a child—Mr. Mericle called James Brozena, the Executive Director of the Luzerne County Flood Protection Authority, to volunteer his services. Ex. C-163. Mr. Mericle immediately mobilized his employees, equipment, and materials to reinforce the levee system on both sides of the Susquehanna River. As flood volunteer Andy Tuzinski, who served as Emergency Management Coordinator for the Borough of Forty Fort, observes, "[a]t all times during the operation, Rob Mericle placed himself in harm's way by standing alongside and working with his employees, contractors and our emergency responders." Ex. C-158.

Mr. Tuzinski credits Mr. Mericle with "directly prevent[ing] a catastrophic failure of the levee system that protects Forty Fort and surrounding communities from the Susquehanna River." *Id*. As volunteer engineer Tom Lawson explains, "Rob's forty five trucks constantly delivering heavy rock to fortify the levee was the difference between success and miserable failure. . . . Without Rob[']s help, I

have no doubt the levee system would have failed causing billions of dollars in damage[] and long term hardship for tens of thousands of people." Ex. C-156; *see also* Ex. C-160 (Letter of Matthew Schooley, President of the Forty Fort Cemetery Association) ("[T]he west side of the Wyoming Valley is totally indebted to Rob Mericle for preventing another incident that would have surpassed in scale the destruction incurred as a result of Hurricane Agnes in 1972!"); Ex. C-163 (Letter of James Brozena, describing Mr. Mericle's and his employees' actions as "heroic"); Ex. C-185 (Letter of Joe Chacke, President of Forty Fort Borough Council).

Mr. Mericle's service did not end when the rain stopped. He provided assistance to clean up towns affected by the flooding for months afterward. "[H]e helped anyone and everyone he could." Letter of Erin Gallagher (Ex. C-175). "He and his crew didn't ask names, they just helped anyone who needed help." Letter of Nora Donato (Ex. C-168). They "replaced scores of electrical services throughout the flooded areas and asked for nothing in return." Letter of Stephen M. Lawrence (Ex. C-179). As one affected individual explains,

> I had 4½ feet of water inside the house, collapsed garage and debris covering my entire property of 2½ acres. Rob sent a bulldozer and excavating equipment to my property along with two of his employees. They came every day for a week until my entire property was completely cleaned and cleared. I knew the cost would be in the thousands, being underinsured and having trouble trying to get the insurance money owed I wasn't sure I could pay him. When I asked Rob how much I owe he said "absolutely nothing."

When I offered to at least pay his employees, again he refused. Thinking of this story and Rob's generosity to this day brings tears to my eyes.

Letter of Aldo Sartorio (Ex. C-171).

Judy Stevenson, whose home also was flooded, writes:

The water reached 7 feet on my first floor, and our basement was . . . filled with floodwater. . . . I walked outside and there were a few men standing in my front yard, a tall gentleman approached me and asked if he and his employees could help. That man was Rob Mericle.

For the next few hours, Rob and his men worked to pump out my basement. When he realized the floodwaters had ripped my hot water heater from the waterline and was continuing to po[u]r water in my basement, he sent a plumber down to stop the leak.

Rob Mericle's compassion kindness and generosity at my family's time of greatest need cannot be measured. Prior to this event I had never met Rob Mericle, he simply saw a fellow citizen who needed help and never asked for anything or payment in return.

Ex. C-172. Others have shared similar experiences.[12] Additional information about Mr. Mericle's flood relief work is included in Exhibit A. *See also* Ex. B-16-25 (photographs).

7. **Commitment to the Community.**

Mr. Mericle's community service began more than 30 years ago. During the four years he operated his toy business in college, Rob and his father closed the family hardware store early on Christmas Eve, loaded the store van with toys he donated from his inventory, and delivered them to children living in Wilkes-

---

[12] *See*, *e.g.*, Exs. C-170, C-177, C-178, C-180 (Letters of Kyle Drendall, Stephen and Jeriann Sokach, John Wesolowski, and Thomas Allardyce).

Barre's low-income housing areas. That experience inspired a lifetime of giving back to the community.

Anthony Lagalante, who has known Rob for more than 25 years, attests that Rob's "generosity is not a recent attribute; he has always been one of the most giving people that I have ever known." Ex. C-19. "Many successful individuals don't contribute the time and resources Rob has over so many years. It has to be in their heart. He had that kind of heart well before he became a prominent businessman." Letter of Thomas Lawson (Ex. C-155).[13]

In the past 15 years, Mr. Mericle has donated more than $19 million—more than 20% of his gross income—to numerous non-profit organizations. *See* Letter of Jennifer Kebles (Ex. C-254-55). He also has contributed his time and talents to create millions of dollars in additional value for local nonprofits. Rob has managed and donated more than 60,000 hours of his employees' time. *See id.* He has personally contributed more than 5,000 hours of his own time on projects that benefited local non-profits and those in need. *See id.*

The following are examples of Mr. Mericle's extensive work for charitable organizations and projects. Additional information is set forth in Exhibit A.

---

[13] *See also* Letter of Patricia Leighton (Ex. C-58); Letter of Carol Crane (Ex. C-146); Letter of Robert Sutkowski (Ex. C-187).

### A. Greater Wilkes-Barre Family YMCA.

Mr. Mericle has been deeply involved for more than twenty years in assisting the YMCA to help impoverished young people in the community. Executive Director James Thomas explains:

> The YMCA is surrounded by schools in our community where more than 50% of the children are below the federal poverty level. Rob's drive is to help these children who most need the YMCA and the programs we offer them.

Ex. C-114-15; *see also* Letter of Former YMCA President Patrice Persico (Ex. C-116); Letter of Gretchen Sevison (Ex. C-119).

Mr. Mericle has "helped [the Y] through 2 major renovations and upgrades to our Y facility." Letter of Dr. Durelle Scott (Ex. C-125). In 1999, he provided free construction management services for a $5 million capital improvement project for the downtown Wilkes-Barre YMCA building. The building desperately needed updating, and the project included plans for a new gym and a six lane indoor pool:

> Rob rolled up his sleeves and combed through every inch of the plan and change-orders; he met tirelessly with the all-volunteer (and I might add novice) committee, often educating us to the nuances of the plan; he met with the architects and engineers; and ultimately guided the Y through a very uncomfortable, yet necessary separation from the contractor and search for a new one.

Letter of Patrice Persico (Ex. C-116-17). Mr. Mericle also donated $500,000 for the new pool.

Mr. Mericle has devoted extensive time and resources to the YMCA's Camp Kresge, a camp for underprivileged children. In 2004, Mr. Mericle created a new income-generating program for the camp that generated $800,000 for the Y. *See* Letter of Kate Button (Ex. C-118).[14] Mr. Mericle also started a camp program called Blue Sky, which is "designed to give low income children an educational wildlife experience with our camp." *Id.*; *see also* Ex. C-121 (Letter of Director of Camping Services Michael McElinney).[15]

As Director Thomas observes, "Rob's community service at the YMCA, through his volunteerism, reflects his devotion to improve the lives of those less fortunate and has made him a great role model." Ex. C-114-15. Additional information concerning Mr. Mericle's support of the Y is set forth in Exhibit A. *See also* Ex. B-1-2 (photographs).

### B. Junior Achievement of Northeastern Pennsylvania.

Rob has been involved in Junior Achievement ("JA") for almost fifteen years. JA educates students about economics and business to prepare them to

---

[14] "Rob helped put together a forest land management program in which the YMCA was able to harvest timber, a renewable resource, and benefit from the proceeds. The timbering funds were used to support our aging YMCA building and provide much needed programming for low income kids." Letter of James Thomas (Ex. C-114-15).

[15] Mr. Mericle committed almost 2,500 scholarships for the program for the 2013 and 2014 camping seasons. He also "funded the completion of the camp[']s waste water treatment project which enabled the camp to continue to operate." Letter of Kate Button (Ex. C-118).

become productive members of the workforce.  In 2003, JA President Kathleen

Matthews spoke to Mr. Mericle about her dream of creating a model city where

students could interact in a real-life setting to better understand what they learn in

the classroom.  Ex. C-110.  Rob conceptualized a new state-of-the-art facility and

designed and built a 15,000 square foot building, which he donated to JA.  He

brought to life a realistic indoor city where students enjoy an experiential learning

program and assume the roles of business owners, employees, and consumers.

> As current JA President Melissa Turlip explains,

> What makes Mr. Mericle's commitment to [JA] so special was his direct
> involvement with every aspect of the planning and construction process. . . .
> At every turn, Rob Mericle asked questions and provided the support needed
> to ensure [JA] was successful in this new venture, and not once did he ask
> for or expect any recognition.

Ex. C-112.  Mr. Mericle covered the entire cost of the real estate for the facility, as

well as the cost of the building and its interior improvements, all of which

exceeded $3.75 million, and both he and his employees devoted extensive time to

the project.  The new facility:

> has become the model for several other JA sites around the county, and is
> currently one of only 30 such sites in the world. . . . [It] would never have
> been possible without the vision and generosity of Rob and his family
> through their commitment of the land, construction, and one-of-a-kind
> interior fit out.

Letter of Kathleen Matthews (Ex. C-110-11).  In addition, "each year Rob has

provided the organization with funding for program materials, scholarships and

even covered busing costs so students can have this outstanding opportunity." *Id.*

"To put it simply, Junior Achievement . . . would not be able to provide the educational opportunities available to our local students if it weren't for Mr. Mericle's support." Ex. C-112-13. Additional details concerning Mr. Mericle's support of JA are set forth in Exhibit A. *See also* Ex. B-3 (photographs).

## C. Candy's Place Cancer Wellness Center and Hospice of the Sacred Heart.

Mr. Mericle has been a supporter of Candy's Place Cancer Wellness Center "since its inception" in 1998. Ex. C-104 (Letter of Juanita Namey). Candy's Place is devoted to providing services and support to cancer patients, survivors, and their loved ones.

In 2005, Rob designed and constructed a new facility for the Center that greatly expanded its space and provides a supportive environment for cancer patients and their loved ones. The new facility includes a gym/yoga studio, a library, an activity room, a massage and therapy room, and a home-like living room. Rob funded the entire cost of the improvements and has paid the Center's annual rent ever since. As Peggy Cunningham, the Center's founder explains, "[w]e could never have comforted our patients in such a warm environment without such a generous offer. . . . I have never met such a kind and generous person, not only to family and community but to others in need." Ex. C-101.

In 2011, Mr. Mericle stepped in again. He renovated additional space adjacent to the Center so that it could expand into a larger space and serve additional patients. He continues to pay the rent on this newly-enlarged facility, at a value to the Center in excess of $70,000 per year. Additional details concerning Mr. Mericle's assistance to the Center are set forth in Exhibit A. *See also* Ex. B-4, B-8 (photographs).

Mr. Mericle also stepped in to help the Hospice of the Sacred Heart in a time of need. Dr. Frank Bucci, the founder and Chairman of the hospice, writes that he is "very grateful to Rob for his compassion and understanding of what was necessary to overcome the hospice's difficult and unexpected financial challenges experienced in 2008." Ex. C-103.

### D. Wyoming Valley Catholic Youth Center.

The Catholic Youth Center ("CYC") is a community-based organization that provides recreational opportunities for the children of Wyoming Valley. Former Executive Director Anthony English explains that "Mr. Mericle came to CYC as a young man out of college beginning a business and wanting to serve his community. He served on the CYC Board of Directors, Annual Appeal Drive Committee, [and] Athletic Council and in each of these roles, performed in an exceptional manner to accomplish goals and sense of purpose." Ex. C-105-06. "When it came time for our agency to expand, we turned to Mr. Mericle for his

guidance and assistance. It was through his personal effort of gathering a committee, soliciting funds, conducting meetings and being my personal advisor that we were able to complete a four million dollar project." *Id.*; *see also* Ex. C-52-53 (Letter from Board Chairman Maureen Bufalino).

Mr. Mericle created the March Madness fundraising program for the CYC in 2006, when the organization was experiencing financial difficulties. As volunteers Gary and Katie Lambert explain, "[a]fter a lot of hard work and solicitation, we pulled together a great event that raised much needed monies for the CYC. This fundraiser has continued each year since and Rob has been the largest supporter . . . contributing over $500,000 himself." Ex. C-107-08. March Madness is now the CYC's largest annual fundraiser with proceeds going toward children's drug and alcohol prevention programming.[16]

### E.  Pittston Area Educational Improvement Organization.

In 2005, Mr. Mericle worked with the Pittston Area School District to create the Pittston Area Educational Improvement Organization ("PAEIO"), whose mission is to provide funding for educational programs for students. After Lowe's located its new building in Jenkins Township, Mr. Mericle made a commitment to

---

[16] Mr. Mericle also was major contributor toward the construction of the CYC's aquatic center, which was completed in 2003. He provided free project management services, plumbing and electrical work, and helped design and construct the new aquatic center. *See* Ex. B-5 (photographs). He also helped establish a learning center, which provides computers and other learning tools for the children.

give $100,000 to the PAEIO and to provide $250,000 of free construction work to Lowe's, in exchange for Lowe's commitment to contribute $2,000,000 over ten years to the PAEIO.  Thus far, these funds have been used for an early childhood reading program and technology upgrades for classrooms in the Pittston Area schools.  Thousands of children will benefit from Mr. Mericle's involvement with the PAEIO.  He has plans to replicate this program in other area school districts as well.

### F.    Lend A Hand Program.

In 1998, Mr. Mericle formalized his "Lend a Hand" program to help non-profit organizations complete projects in support of their missions.  In 2009, he added to the program with an initiative to support local communities by restoring their deteriorated parks, fields, courts, and playgrounds.  Rob donates all of the necessary materials, tools, construction equipment, and labor, and then he and his family, alongside his employees, personally work on  the projects.  *See* Letter of MCRES employee Bryan T. McManus (Ex. C-244).  "His actions were not just a monetary contribution; it was an act of giving his time and rallying the company and community to make a difference."  Ex. C-262-63 (Letter of Albert Guari); *see also* Letter of Carmen Ambrosino (Ex. C-144-45).  Examples of the work done by these programs are set forth at page 4 of Exhibit A.  *See also* Ex. B-9-15 (photographs).

### G. Other Charitable Work and Contributions.

Mr. Mericle also has contributed extensive time, energy, and resources to numerous other non-profit organizations, including the Weinberg Northeast Regional Food Bank,[17] the Osterhout Free Library,[18] the Children's Service Center of Wyoming Valley,[19] Volunteers in Medicine,[20] the Wyoming Seminary,[21] and many other programs and institutions. Mr. Mericle's numerous other charitable good works and donations are summarized in Exhibit A.

### 8. The Advisory Sentencing Guideline Calculation.

The parties agree that Mr. Mericle's offense level under the advisory Sentencing Guidelines is 11. *See* PSR ¶¶ 57-64; U.S.S.G. §§ 2X4.1 & 3E1.1(a). Mr. Mericle has no criminal history. *See* PSR ¶ 69. An offense level of 11 is in Zone B. *See* PSR ¶ 96. The government has filed a motion pursuant to U.S.S.G. § 5K1.1 to reduce Mr. Mericle's offense level by one level.[22] An offense level of

---

[17] *See* Ex. C-142 (Letter of Eugene Brady).

[18] *See* Ex. C-52 (Letter of Maureen Bufalino, Board President).

[19] *See* Exs. C-137, C-139 (Letters of Michael S. Rifkin and Joseph DeVizia).

[20] *See* Ex. C-143 (Letter of Dr. Susan Sordoni).

[21] *See* Ex. C-133, C-135 (Letters of Kip Nygren and Randolph Granger).

[22] Mr. Mericle will respond to the government's motion. He has reserved the right to request the Court to grant a larger downward departure under U.S.S.G. § 5K1.1. The parties also agree that Mr. Mericle has the right to ask the Court for a variance from the final advisory Guidelines range. *See* PSR ¶ 6.

10 also is in Zone B.  As the PSR explains, a sentence of probation is authorized in

Zone B as long as the Court requires an appropriate period of home detention.

PSR ¶ 101 (citing U.S.S.G. § 5B1.1(a)(2); *see also* U.S.S.G. § 5C1.1(c)(3)).[23]

## ARGUMENT

Calculation of the correct offense level under the Sentencing Guidelines is

the "starting point and the initial benchmark" in any sentencing proceeding.  *Gall

v. United States*, 552 U.S. 38, 49 (2007) (emphases omitted).  However, "[t]he

Guidelines are not only not mandatory on sentencing courts; they are also not to be

presumed reasonable."  *Nelson v. United States*, 555   U.S. 350, 352 (2009) (per

curiam).

"It has been uniform and constant in the federal judicial tradition for the

sentencing judge to consider every convicted person as an individual and every

case as a unique study in the human failings that sometimes mitigate, sometimes

magnify, the crime and the punishment to ensue."  *Koon v. United States*, 518 U.S.

81, 113 (1996).  After calculating the proper offense level under the Guidelines,

"the district judge should then consider all of the § 3553(a) factors" and "make an

individualized assessment based on the facts presented," *Gall*, 552 U.S. at 49-50,

---

[23] A sentence of probation may be imposed for an offense level in Zone A (offense
level 8 or lower).  U.S.S.G. § 5B1.1(a)(1).

so as to "tailor the sentence" to fit the circumstances of the case, *United States v. Booker*, 543 U.S. 220, 245 (2005).

We respectfully submit that Mr. Mericle's case presents a unique combination of mitigating factors supporting a sentence of probation pursuant to 18 U.S.C. § 3553(a). *See United States v. Howe*, 543 F.3d 128, 139 (3d Cir. 2008) ("[T]he § 3553(a) factors in their totality reasonably support the sentence imposed in this case.").

## I. THE § 3553(a) FACTORS SUPPORT A DOWNWARD VARIANCE TO A SENTENCE OF PROBATION.

### A. § 3553(a)(1).

#### 1. Nature and Circumstances of the Offense.

The "nature and circumstances of the offense" do not call for imprisonment in Mr. Mericle's case. As discussed above, Mr. Mericle's offense conduct was his failure to disclose information to federal agents that former judges Ciavarella and Conahan were the ultimate recipients of entirely lawful referral fees, which the former judges mischaracterized on their tax returns. This is not to suggest that the conduct was not serious—it was. But, as the government acknowledged during Mr. Mericle's plea colloquy, Mr. Mericle is differently situated than others involved in this investigation. *See* Ex. E at 15, 19. The government has acknowledged that Mr. Mericle did not pay any bribes or kickbacks to the former judges and Mr. Mericle had no involvement in the illegal actions of defendants

Ciavarella, Conahan and Powell regarding Pennsylvania Child Care. *See id.* at 16-17. Likewise, Mr. Mericle had no personal or financial interest in the placement of the children in the facilities. *See generally* pp. 3-6, *supra*.

## 2. History and Characteristics of the Defendant.

Mr. Mericle's personal history and characteristics present compelling mitigating circumstances weighing in favor of a probationary sentence. Mr. Mericle's lifetime of generosity and kindness to others, his decades of charitable and civic contributions, the widespread positive impact of his hard work on the Northeastern Pennsylvania community, his genuine remorse, and the support he has received from members of the community strongly support a sentence of probation.

### a. Mr. Mericle's Extraordinary Charitable Good Works.

It is well settled that the Sentencing Guidelines permit a downward departure or variance based on a defendant's "exceptional" good works. *See United States v. Tomko*, 562 F.3d 558, 563, 572 (3d Cir. 2009) (en banc); *United States v. Cooper*, 394 F.3d 172, 176 (3d Cir. 2005); *United States v. Serafini*, 233 F.3d 758, 773 (3d Cir. 2000). In fashioning an appropriate sentence in this case, we respectfully ask the Court to consider Mr. Mericle's lifelong commitment to the Northeastern Pennsylvania community, his extraordinary civic and charitable contributions, and his many acts of kindness. *See* pp. 12-29, *supra* & Exhibit A.

Mr. Mericle's community service and charitable works "are not the detached acts of charity one might ordinarily expect from a wealthy business executive." *Cooper*, 394 F.3d at 177. Instead, "[t]hey are, in a very real way, hands-on personal sacrifices, which have had a dramatic and positive impact on the lives of others." *Id.* Mr. Mericle's good works are more extensive than those the Third Circuit has deemed sufficient to support a downward variance or departure.[24] He has freely and generously given his time, talent, business expertise, and energy to help others in personal and meaningful ways. His acts have been big and small—

---

[24] In *Serafini*, for example, the Third Circuit affirmed a three-level departure for a defendant who provided a financial guarantee for a friend's medical treatment, gave a widow $750 to forestall a foreclosure on her mortgage, forgave a substantial debt, contributed to scholarships, performed community service, and donated to charitable organizations. 233 F.3d at 773-74. He also mentored a college student and loaned the student money to return to college. *Id.* at 774.

In *Cooper*, the Third Circuit affirmed a four-level departure where the defendant organized and ran a youth football team in a depressed area of Pittsburgh, coached and mentored high school athletes, paid for four of the athletes to attend a better high school, and helped one of the athletes attend college. 394 F.3d at 177-78.

In *Tomko*, the *en banc* Third Circuit affirmed a variance to a non-custodial sentence based in part on the defendant's good works. 562 F.3d at 571. The defendant participated in a holiday gift drive for several years, helped a young widow with a family, helped his employees with personal issues, and, after his indictment, volunteered his time and construction expertise to construct houses with Habitat for Humanity. *Id.* at 572; *see also United States v. Bortnick*, No. 03-CR-0414, 2006 WL 680544, at *6 (E.D. Pa. Mar. 15, 2006) (granting departure because defendant spent $100,000 for the grandchild of an employee in Russia to fly to Philadelphia twice for surgery for her baby that could not be obtained in Russia and spent time comforting her); *United States v. Bennett*, 9 F. Supp. 2d 513, 525 (E.D. Pa. 1998) (granting departure where defendant worked in drug counseling and prevention programs, created an organization to help non-profits obtain funding, and provided financial consulting for a group called "Teen Challenge").

from making large donations and managing major construction projects for charitable organizations to reaching out to help a neighbor in need.

Mr. Mericle's charitable and civic contributions are far beyond the ordinary. As Landmark Community Bank President and CEO, Daniel Nulton, puts it in a letter to the Court: "Over the years many people have contributed great sums of money to worthy charities and projects but Rob went well beyond monetary contributions. Rob was generous with his time and his resources but more importantly with his mind. I cannot ever pretend to offer a complete list of people and organizations that have benefited from his contributions." Ex. C-225.

### b. Mr. Mericle's Profound Remorse for His Conduct.

"[A] defendant's degree of remorse at sentencing may be considered as a basis for downward variance under § 3553(a)." *Howe*, 543 F.3d at 138. Mr. Mericle is deeply remorseful for his actions. As MCRES employee Jennifer Kebles explains, "[f]rom having worked with Mr. Mericle during the last five years, I know that he deeply regrets his past offenses and that he is deeply committed to setting things right." Ex. C-255.

Erin Griffin recounts that Mr. Mericle wanted to attend the company picnic so he could "personally talk to all of his employees and tell them how sorry he is." Ex. C-36. Another friend shares that, when he told Mr. Mericle he was sorry about his situation, "Rob said that he took full responsibility and that he was sorry too.

Then he said that he was determined not to let this be what he leaves our area. He said that he was going to use this problem to 're-double his efforts' to do more for the community and charities and to create jobs." Letter of Joseph Durkin (Ex. C-191); *see also* Letter of Kim Borland (Ex. C-6).

Mr. Mericle's actions also reflect his remorse. He publicly acknowledged his misconduct both when he testified as a government witness at the Ciavarella trial and during his plea colloquy, and he has provided significant assistance to the government in its investigation and prosecution of other defendants.

### c.    Community Support for Mr. Mericle.

The Court also may consider the support of a defendant's community and family when determining whether to grant a variance. *See, e.g.*, *Howe*, 543 F.3d at 137, 139; *United States v. Jackson*, 390 Fed. Appx. 130, 134 (3d Cir. 2010). The fact that a defendant "enjoy[s] the broad support of family, friends, colleagues, and teachers" supports a downward variance. *Howe*, 543 F.3d at 140 (quoting *United States v. Wachowiak*, 496 F.3d 744, 754 (7th Cir. 2007)).

As demonstrated by the more than 150 individuals who have written letters to this Court, many members of the community stand behind Mr. Mericle. These letters are striking not only for their volume but also their breadth. The writers include family and friends, leaders of industry and MCRES employees, business associates, and leaders of charitable organizations. This support reflects what one

friend calls "a mutual loyalty that define[s] Rob's relationship with all of his friends." Letter of Ira Grossman (Ex. C-34). These people, who have experienced such kindness from Mr. Mericle, continue to "stand by him today, in good times and challenging times." Letter of Francis Hoegen (Ex. C-54).

Like Mr. Mericle's family and friends, many members of the larger community "look forward to his continued active participation in the business world and in the entire fabric of life of our community." Letter of Patrick Sammon (Ex. C-228); *see also* Letter of John Gadomski ("I look forward to working with him for many years to come.") (Ex. C-229). "Rob is needed in this community . . . . He is the kind of person who genuinely cares about people and the community. . . . His acts of charity are from the heart." Letter of Nora Donato (Ex. C-169). As the President of the Greater Scranton Chamber of Commerce writes,

> I was dismayed for our community by the possibility that this error in judgment would deprive us of a driving force that has done so much good here. . . . His ability to learn from his mistakes and to focus his future on community betterment projects will be of benefit to us all.

Ex. C-211-12.

The recently-retired Executive Director of the CYC echoes this sentiment:

> He is a first class man and a first class leader . . . whom the CYC respects and loves very deeply. Mr. Mericle is a light that shines on every young person who frequents CYC. Please, your honor, on behalf of the children of Wyoming Valley let his light become brighter and continue to shine on our kids.

Ex. C-106.

#### d. Mr. Mericle's Strong Employment History.

A defendant's "excellent employment history" is another factor that the Court may consider in favor of a downward variance when it applies the § 3553(a) factors to a particular case. *Jackson*, 390 Fed. Appx. at 134; *see Tomko*, 562 F.3d at 571.

Mr. Mericle is known for his work ethic. He began MCRES from scratch and has grown that business consistently for the past 29 years. His brother-in-law, who "watched him grow a successful business by working 6 days a week, 12 hours a day," calls him "the hardest worker I've ever met." Ex. C-11. "There is no one in the Company who works longer or harder than Rob Mericle." Letter of Lewis Sebia (Ex. C-251). "He maintains long and very busy workweeks at the office including most weekends even taking work home most nights. He never takes a lunch but rather brown-bags it and eats while he works." Letter of Sheryl Weaver (Ex. C-280). This strong work ethic and employment history, like Mr. Mericle's community support and involvement, ensures that Mr. Mericle will continue to be a valuable and productive member of this community.

#### e. Innocent Third Parties.

The Court also may grant a downward variance based on a defendant's "prominence in [his] company" and the effect that his incarceration would have on innocent third parties such as employees. *Tomko*, 562 F.3d at 571-72 (quotations

omitted). In *Tomko*, for example, the Third Circuit affirmed a non-custodial sentence despite a Guidelines range of 12-18 months in prison, in part because the defendant's incarceration "would threaten the jobs of [his company's] over-300 employees." *Id.*[25]

MCRES has 235 direct employees and more than 200 captive subcontractors. *See* Letter of Jennifer Kebles (Ex. C-254). The average annual salary for Mr. Mericle's employees is $77,000, excluding benefits. *Id.* at C-255. These are family-sustaining jobs in this market. His subcontractors and vendors are predominantly local companies. *Id.* Under Mr. Mericle's leadership, MCRES is a significant job creator and the largest private payer of property taxes in Luzerne County. *See id.* & pp. 11-12, *supra*. Mr. Mericle's planned projects include the construction of approximately 14 million square feet of new buildings, which would bring an additional estimated 11,000 jobs to this area. Ex. C-255. If,

---

[25] *See also United States v. Milikowsky*, 65 F.3d 4, 8 (2d Cir. 1995) (affirming departure to non-custodial sentence from Guidelines range of 8-14 months because defendant was "the only individual with the knowledge, skill, experience, and relationships to run [his businesses] on a daily basis"); *United States v. Scibelli*, No. 08-CR-76, 2008 WL 3925317, at *2 (E.D.N.Y. Aug. 20, 2008) (granting variance to non-custodial sentence from Guidelines range of 10-16 months where defendant operated his construction company, which employed more than 200 people, with a "hands-on approach"); *United States v. Toback*, No. 01-CR-410, 2005 WL 992004, at *6 (S.D.N.Y. Apr. 14, 2005) (granting variance to one day in prison down from Guidelines range of 10-16 months in part because defendant's imprisonment would "threaten[] [his] business's continued prosperity and endanger[] the future employment of its 80 plus employees").

however, he is not able to continue working, new construction would be severely curtailed, if not stopped. Without new development, MCRES could not sustain the 90% of its workforce that is associated with new construction activities.

Importantly, the MCRES business model requires Mr. Mericle's presence to raise capital. *See* Ex. C-254. Rather than construct buildings that are pre-leased to tenants (a model that is more easily financeable), Mr. Mericle's business model builds commercial spaces to attract tenants to this region. *See* Letter of Steven Barrouk (Ex. C-65-66). As a result, the high level of risk associated with such development, especially in a small town market like Northeastern Pennsylvania, requires significant up-front capital. *See id.* Because Mr. Mericle alone has the necessary expertise and track record, and the relationships with national lenders that finance MCRES's building projects, his day-to-day involvement is critical to maintain those relationships and the operation. Ex. C-254.

Finally, Mr. Mericle is involved in virtually every aspect of the company on a day-to-day basis. *Id.* He is the only person in the company with the cross-disciplinary knowledge of construction, finance, brokerage, land development, and leasing to manage the development side of the business on a day-to-day basis. *Id.* Every manager of every division of the company reports directly to Mr. Mericle. He is the only leader the company has ever known.

This case presents the precise scenario envisioned by the Third Circuit in *Tomko*, where a defendant is centrally important to a business on which many innocent third parties rely for their livelihood. We respectfully request that the Court consider the potential economic harm to MCRES's employees and other innocent third parties that would result from a custodial sentence.

**B.    § 3553(a)(2)(A)-(D).**

Imprisonment is not necessary here to "reflect the seriousness of the offense" or "promote respect for the law." 18 U.S.C. § 3553(a)(2)(A). Rather, "just punishment for the offense" can be achieved through a sentence of probation. Through his guilty plea and years of cooperation with the government, Mr. Mericle has shown that he understands the seriousness of his actions. He has accepted the negative consequences of his criminal act during the almost-five year duration of this investigation, and the experience has been devastating for him and his family.

Nor is imprisonment needed to "afford adequate deterrence" here. 18 U.S.C. § 3553(a)(2)(B). There is no chance of recidivism. Mr. Mericle has been publicly shamed. He has pled guilty and admitted his guilt in open court, both in his plea colloquy and during his testimony in the Ciavarella trial. The need for general deterrence exists in any case, but must be balanced with the other Section 3553(a) factors. As the Supreme Court stated in *Gall v. United States*, general deterrence involves promotion of respect for the law, not only through harsh punishment, but

also through appropriate leniency.  552 U.S. at 54-55.  Promoting respect for the law is not furthered "if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Id.* at 54.

Imprisonment is not required to "protect the public from further crimes."  18 U.S.C. § 3553(a)(2)(C).  Mr. Mericle has no criminal history and he has demonstrated a desire to correct his wrongs.  His continued presence is an asset to the Northeastern Pennsylvania community, from the employment and job creation he provides to the extensive community service that he performs.  Imprisonment would not achieve any public benefit.  Finally, a prison sentence is not required to provide Mr. Mericle with "needed educational or vocational training, medical care, or other correctional treatment."  18 U.S.C. § 3553(a)(2)(D).

**C.**     **§ 3553(a)(3).**

There are alternative "sentences available" that better suit the circumstances of this case, including probation.

**D.**     **§ 3553(a)(6).**

The "need to avoid unwarranted sentencing disparities" weighs in favor of a probationary sentence.  Even before any variance, Mr. Mericle's offense level is in Zone B, which permits a probationary sentence when combined with home detention.  PSR ¶ 101.

The primary goal of § 3553(a)(6) is to promote national uniformity of similarly situated defendants. *See United States v. Parker*, 462 F.3d 273, 278 (3d Cir. 2006). The Court should compare Mr. Mericle's sentence to that of other defendants with no criminal record who have entered a guilty plea to misprision of a felony and cooperated extensively with the government, including by testifying at trial.

The sentences of defendants Ciavarella, Conahan and Powell are not the appropriate measuring stick for Mr. Mericle's sentence, particularly where Mr. Mericle "assisted in convicting," *id.*, defendants Ciavarella and Conahan. The government repeatedly acknowledged during Mr. Mericle's plea colloquy that Mr. Mericle is *not* similarly situated to those defendants. *See* Ex. E at 15-19.

The sentences of defendants Ciavarella, Conahan and Powell arise from a very different set of facts, circumstances, and offenses. Unlike Ciavarella, Conahan and Powell—who are not Mr. Mericle's co-defendants—Mr. Mericle had no involvement in the juvenile facilities after his company built them. And, unlike Ciavarella, Conahan and Powell, Mr. Mericle was not involved in any bribe or kickback scheme. The government has acknowledged that Mr. Mericle did *not* pay illegal bribes or kickbacks to the former judges. *See* Ex. E at 15-19. Defendants Ciavarella, Conahan and Powell are not an appropriate reference point here. *See*

*Parker*, 462 F.3d at 278 (even where, unlike here, co-defendants are involved, § 3553(a)(6) "applies only where co-defendants are similarly situated").

### E.  § 3553(a)(7).

The "need to provide restitution to any victims of the offense" does not favor imprisonment.  Restitution is not an issue in this case.  PSR ¶ 108.  Nevertheless, Mr. Mericle has contributed $2,150,000 for the purpose of funding programs for the health, safety and general welfare of children of Luzerne County, and those funds have been distributed.  *See* PSR ¶¶ 2, 4.

## II.  THE COURT DOES NOT NEED TO GRANT A VARIANCE OR DEPARTURE TO SENTENCE MR. MERICLE TO A NON-CUSTODIAL SENTENCE.

Finally, although we respectfully submit that the foregoing considerations warrant a downward adjustment to Mr. Mericle's offense level below the advisory Guideline level and a sentence of probation, the Court does not need to grant a downward departure or variance in order to give Mr. Mericle a non-custodial sentence.

A non-custodial sentence is available and proper under the law based on a Guideline offense level of 10 or 11.  An offense level 10 or 11 with 0 criminal history points places Mr. Mericle in Zone B.  The Guidelines permit a non-custodial sentence within Zone B so long as the Court includes an appropriate term of home detention.  *See* U.S.S.G. § 5B1.1(a)(2); PSR ¶ 101.  Accordingly, even if

the Court decides not to grant any downward adjustment to Mr. Mericle's offense level under the advisory Guidelines, a sentence of probation combined with home detention would still be appropriate.

## **CONCLUSION**

For the foregoing reasons, Mr. Mericle respectfully asks the Court to impose a sentence of probation.

Respectfully Submitted,

By: /s/David M. Zinn
Brendan V. Sullivan, Jr. (admitted *pro hac vice*)
David M. Zinn (admitted *pro hac vice*)
Marcie R. Ziegler (admitted *pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005

William J. Winning (admitted *pro hac vice*)
COZEN O'CONNOR, LLP
1900 Market Street
Philadelphia, PA 19103

Attorneys for Defendant Robert K. Mericle

Dated:  April 11, 2014

# CERTIFICATE OF SERVICE

I, William J. Winning, Esquire, counsel for Defendant Robert K. Mericle, hereby certify that I caused the foregoing Sentencing Memorandum to be served electronically on this date upon the following:

Peter J. Smith, United States Attorney
Christian A. Fisanick, Chief, Criminal Division
Michael Consiglio, Assistant United States Attorney
United States Attorney's Office
Suite 220, Federal Building
228 Walnut Street
Harrisburg, PA 17108

In addition, I caused a copy of the Exhibits to the Sentencing Memorandum to be served by hand on this date on the foregoing.


Dated:      April 11, 2014           /s/ William J. Winning
                                     William J. Winning, Esquire